# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>The property located at 3834 West 116th Street in<br>Hawthorne, California, as described more fully in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>) | Case No.  2:18-mj-2229 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2113(a) | Bank Robbery |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Gary Wallace, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, California

_____
*Printed name and title*

SAUSA: Stacey R. Fernandez, x3152

## **ATTACHMENT A**

PREMISES TO BE SEARCHED

The property located at 3834 West 116th Street in Hawthorne, California, a single family residence with a detached garage ("the SUBJECT PREMISES").  The SUBJECT PREMISES is located on the south side of West 116th Street just east of Doty Avenue and faces north.

The SUBJECT PREMISES to be searched includes: (a) all rooms, porches, containers, and safes in the SUBJECT PREMISES; (b) the driveway, and any garages, carports, storage spaces, or other outbuildings on the SUBJECT PREMISES; (c) any cars or vehicles parked in any garage, carport, driveway, backyard, or otherwise at the residence; (d) any digital devices found at the SUBJECT PREMISES or in the possession of anybody at the SUBJECT PREMISES.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.   The items to be seized are the evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2113(a) (the "Target Offense"), from the SUBJECT PREMISES, as defined in Attachment A, namely:

a.   Gray hoodies, plain white long-sleeve t-shirts, blue denim jeans, dark jeans, baseball caps, and predominantly-white sunglasses, black sunglasses, aviator sunglasses;

b.   Firearms;

c.   Notepads or paper consistent with demand notes presented at the bank robberies that took place between June 19, 2018, and July 7, 2018, as described in the affidavit in support of the instant search warrant;

d.   United States currency over the amount of $1,000;

e.   Photographs of cash and/or firearms;

f.   Maps identifying the location of financial institutions and directions to financial institutions;

g.   Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the place being searched, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, birth certificates, and keys;

h.   Keys belonging to and/or evidence of the existence and usage of any lockers, safe deposit boxes, storage facility, vehicle or other property;

i.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

j.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

   vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   viii. records of or information about Internet Protocol addresses used by the device;

   ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

I.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and

attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Gary D. Wallace, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.     This affidavit is made in support of an application for a criminal complaint against and arrest warrant for NOAH JAMAL STOKES ("STOKES") for a violation of Title 18, United States Code, Section 2113(a) (Bank Robbery).

2.     This affidavit is also made in support of an application for a warrant to search the property located at 3834 West 116th Street in Hawthorne, California, a single family residence with a detached garage ("the SUBJECT PREMISES") for evidence, fruits, and instrumentalities of 18 U.S.C. § 2113(a), as described in Attachment B, which is attached hereto and incorporated herein.  The SUBJECT PREMISES is located on the south side of West 116th Street just east of Doty Avenue and faces north.  The SUBJECT PREMISES is more fully described in Attachment A, which is attached hereto and incorporated herein.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND AND EXPERIENCE OF SPECIAL AGENT GARY WALLACE

4.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since 2017.  I am presently assigned to the Los Angeles Field Office, where I am responsible for investigating violent crimes, including bank robberies, murder, extortion, interstate threats, kidnappings and other violations of federal statutes.  I received 21 weeks of formal training to become an SA at the FBI Academy in Quantico, Virginia, including training on criminal investigative techniques, bank robbery offenses, and violent crimes.

5.    During the course of my employment with the FBI, I have used, or have been involved in investigations that use, various investigative techniques, including witness interviews, review of video surveillance, and collection of physical evidence.  Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods used by bank robbers to take money from banks.  I am also familiar with how bank robbers use digital devices to facilitate and conceal their crimes.

## III. SUMMARY OF PROBABLE CAUSE

6.    The FBI is investigating a series of eight bank robberies that have taken place between June 19, 2018, and July 7, 2018, and appear to have been committed by the same individual.  All eight robberies took place in Los Angeles County, and during each robbery the subject entered a bank and demanded money with a note.  The subject threatened that he had a gun in one of the bank robberies, and he threatened to shoot

2

the victim teller in another bank robbery.  The subject has short black hair with a twirly-shaped design shaved in the front and law enforcement therefore refers to the subject as the "Twirly Head Bandit."  Based on subsequent investigation, including a tip provided to the FBI, the "Twirly Head Bandit" has been identified as STOKES.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

 **A.** **Surveillance Footage and Witness Reports Show the Same Subject, the "Twirly Head Bandit," Was Present at Eight Robbery/Attempted Robbery Locations**

 7. Based on my personal participation in the investigation and my review of reports and other documentation regarding the robberies, including images from the bank robberies, I know the following:

 <u>Chase Bank Robbery on June 19, 2018</u>

 a. On June 19, 2018, at approximately 5:40 p.m., the subject stole $5,530 from the Chase Bank, a federally insured institution, located at 8985 Venice Boulevard in Los Angeles, California.  I have spoken with FBI SA Catherine Moore and reviewed the Los Angeles Police Department report related to the incident, including victim and witness statements, and thereby learned the following:

 i. The subject entered the bank, approached the teller window, and gave the teller a demand note.  I reviewed the demand note and saw that it stated, "Give me all your 100's 50's 20's. Dont [sic] make No sudden Moves but getting the money".

ii.   After reading the note, the victim teller
gave a stack of cash containing 100s, 50s and 20s to the
subject.   The victim teller then activated the bank's silent
alarm and the subject left the bank.

iii. Witnesses described the subject as a black
male, approximately 5'10", approximately 200 pounds, with an
unshaven short beard, wearing a gray hoodie, blue denim jeans, a
baseball cap, and American Flag sunglasses.

iv.   I reviewed surveillance images from the
incident and saw that the subject was a black male, medium
height, medium build, with a black unshaven short beard and a
mustache, wearing a gray hoodie, blue denim jeans, a baseball
cap, and predominantly-white sunglasses.

<u>Bank of America Attempted Robbery on June 25, 2018</u>

b.   On June 25, 2018, at approximately 5:22 p.m., the
subject attempted to steal money from the Bank of America, a
federally insured institution, located at 9453 Culver Boulevard
in Culver City, California.   I responded to the crime scene,
interviewed witnesses, reviewed surveillance images, and thereby
learned the following:

i.   The subject entered the bank, approached the
teller window, and gave the victim teller a demand note.   I
reviewed the demand note and saw that it stated, "I want all
your 50's 100's 20's Dont [sic] make any sudden movements".

ii.   After reading the note, the victim teller
activated the bank's silent alarm and told the subject "no."

The subject said "hurry up please, I need this money." The victim teller replied, "no" and the subject left the bank.

       iii. Witnesses described the subject as a black male, approximately 5'10" to 6', approximately 150 to 170 pounds, in his early to mid-20s, with short black hair and a black sparse beard, wearing a plain white long-sleeve t-shirt, dark jeans, and black sunglasses.

       iv. I reviewed surveillance images from the incident and saw that the subject was a black male, medium height, medium build, in his early to mid-20s, with a black mustache, goatee and short black hair that had a twirly-shaped design shaved in the front, wearing a plain white long-sleeve t-shirt, dark jeans, and black Aviator sunglasses.

<u>Chase Bank Robbery on June 28, 2018</u>

       c. On June 28, 2018, at approximately 5:30 p.m., the subject stole $1,700 from the Chase Bank, a federally insured institution, located at 102 West Foothill Boulevard in Monrovia, California. I have spoken with FBI SA Stephen May and reviewed the Monrovia Police Department report related to the incident, including victim and witness statements, and thereby learned the following:

       i. The subject entered the bank, approached the teller window, and gave the teller a demand note. I reviewed the demand note and saw that it stated, "Stay Calm. I want all your 100, 50, 20 No Bait money or Dye Packs. Dont [sic] make no sudden moves or else".

ii.   After reading the note, the victim teller gave money to the subject, the subject left the bank, and the victim teller activated the bank's silent alarm.

iii. Witnesses described the subject as a black male, approximately 5'9" to 5'10", approximately 160 to 170 pounds, with short black hair, wearing a plain white long-sleeve t-shirt, and Aviator sunglasses.

iv.   I reviewed surveillance images from the incident and saw that the subject was a black male, medium height, medium build, with short black hair, wearing a plain white long-sleeve t-shirt, blue jeans, and black sunglasses.

Citibank Attempted Robbery on July 6, 218

d.   On July 6, 2018, at approximately 11:08 a.m., the subject attempted to steal money from the Citibank, a federally insured institution, located at 161 West California Boulevard in Pasadena, California.  I have spoken with SA May and reviewed the Pasadena Police Department report related to the incident, including victim and witness statements, and thereby learned the following:

i.   The subject entered the bank, approached the teller window, and gave the victim teller a demand note.  I reviewed the demand note and saw that it stated, "I want all your 100's, 50's, 20's No Sudden Move No Dye Packs".

6

ii.   After reading the note, the victim teller gave money to the subject, and the subject left the bank and drove away.[1]

iii.   Witnesses described the subject as a black male, approximately 5'8", approximately 170 pounds, with buzz-cut hair and a thin mustache, wearing a plain white long-sleeve t-shirt, and sunglasses.

iv.   I reviewed surveillance images from the incident and saw that the subject was a black male, medium height, medium build, with short black hair and a black mustache, wearing a plain white long-sleeve t-shirt, dark jeans, and black Aviator sunglasses.

<u>Bank of America Attempted Robbery on July 7, 2018</u>

e.   On July 7, 2018, at approximately 9:46 a.m., the subject attempted to steal money from the Bank of America, a federally insured institution, located at 1450 West Redondo Beach Boulevard in Gardena, California.   I have spoken with FBI SA Daniel Clift and reviewed victim and witness statements, and thereby learned the following:

i.   The subject entered the bank, approached the teller window, and gave the victim teller a demand note. According to the bank manager, the demand note stated, "I want all your 100s, 50s, 20s No sudden movements No dye packs No bait".

---

[1] I reviewed surveillance images from the incident and saw a gray newer model four-door sedan, possibly an Infiniti, without any license plates or other identifying marks, driving away from the bank shortly after the subject left the bank.

ii.   After reading the note, the victim teller activated the bank's silent alarm, walked over to her manager and informed her manager that she was being robbed, at which time the subject left the bank.

iii. Witnesses described the subject as a black male, approximately 5'10" to 5'11", in his late 20s, with short black hair, wearing a white long-sleeve t-shirt, and black round sunglasses.

Bank of America Attempted Robbery on July 7, 2018

f.   On July 7, 2018, at approximately 11:11 a.m., the subject attempted to steal money from the Bank of America, a federally insured institution, located at 13905 Pioneer Boulevard in Norwalk, California.  I have spoken with SA May and reviewed the Los Angeles Sheriff's Department ("LASD") report related to the incident, including victim and witness statements, and thereby learned the following:

i.   The subject entered the bank, approached the teller window, and gave the victim teller a demand note. According to the victim teller, the demand note stated, "I want all 100's, 50's 20's no dye pack, no sudden moves, and no bait money".

ii.   After reading the note, the victim teller walked over to her manager, at which time the subject left the bank.

iii. Witnesses described the subject as a black male, approximately 6'2", with short hair, wearing a white t-shirt, dark jeans, and sunglasses.

8

iv.   I reviewed surveillance images from the incident and saw that the subject was a black male, medium height, medium build, with short black hair, black mustache and goatee, wearing a plain white long-sleeve t-shirt, dark jeans, and black Aviator sunglasses.

<u>U.S. Bank Robbery on July 7, 218</u>

g.   On July 7, 2018, at approximately 11:35 a.m., the subject stole $382.55 from the U.S. Bank, a federally insured institution, located at 15943 Paramount Boulevard in Paramount, California.[2]  I have spoken with SA Clift and reviewed the LASD report related to the incident, including victim and witness statements, and thereby learned the following:

i.   The subject entered the bank, approached the teller window, and gave the victim teller a demand note. According to the victim teller, the demand note stated, "Give me all your hundreds.  No dye packs.  No sudden moves.  Hurry. Please return the note or I'll shoot."

ii.   After reading the note, the victim teller typed a message in his computer to inform his manager that he was being robbed, at which time the subject said, "Hurry up! Hurry up bro!" and pointed at his right hip, intimating that he

---

[2] A previous affidavit submitted in connection with an application for historical "cell-site" or cell tower logs information, <u>United States v. Search Warrant</u>, 18-MJ-2016, indicated that the subject stole $400 from this location on this date.  This amount was the initial loss reported by the assistant branch manager immediately following the bank robbery. On August 20, 2018, the branch manager provided the results of a financial audit that indicated the actual loss amount was $382.55.

had a weapon.  The victim teller then gave money and the demand note to the subject, who then left the bank.

        iii.  Witnesses described the subject as a black male, approximately 5'8" to 5'9", thin build, with short black hair, wearing a white long-sleeve t-shirt, blue jeans, and black sunglasses.

        iv.  I reviewed surveillance images from the incident and saw that the subject was a black male, medium height, medium build, with short black hair, black mustache and goatee, wearing a plain white long-sleeve t-shirt, and black sunglasses.

    <u>Chase Bank Attempted Robbery on July 7, 2018</u>

        h.  On July 7, 2018, at approximately 2:30 p.m., the subject attempted to steal money from the Chase Bank, a federally insured institution, located at 1435 East Gage Avenue in Los Angeles, California.  I have spoken with FBI SA Michael Alker and reviewed the LASD report related to the incident, including victim and witness statements, and thereby learned the following:

        i.  The subject entered the bank, approached the teller window, and gave the victim teller a demand note.  I reviewed the demand note and saw that it stated, "NO SUDDEN MOVES Give me all your 100's 50's 20's NO DYE PACKS I have gun and will use it".

        ii.  After reading the note, the victim teller told a co-worker that she was being robbed, and the subject said, "Hurry up, hurry up, hurry up," and motioned to his left

side with both of his hands.  The victim teller then activated the bank's silent alarm, and the subject left the bank.

        iii. Witnesses described the subject as a black male, approximately 5'9", approximately 150 pounds, age 18-25, with short black hair and a patchy beard along his jawline, wearing a white long-sleeve t-shirt, dark pants, and Aviator sunglasses.

        iv.  I reviewed surveillance images from the incident and saw that the subject was a black male, medium height, medium build, with short black hair, black mustache and goatee, wearing a plain white long-sleeve t-shirt, and black sunglasses.

    8.  Based on the descriptions provided by the witnesses and my own review of the surveillance images, along with the similar language in the demand notes, I believe that the robberies were committed by the same individual.

**B.  Identification of STOKES as the "Twirly Head Bandit"**

    9.  On June 29, 2018, the FBI's Los Angeles Office of Public and Congressional Affairs office released surveillance images from several of the "Twirly Head Bandit" robberies, including an image from the June 25, 2018, robbery where the twirl design is clearly visible, and requested that the public share any information that might assist in the identification of the subject.

    10.  Based on my conversations with SA Moore, I know the following:

a.   On August 14, 2018, the FBI Public Access Line received a tip that the Twirly Head Bandit was an individual with the name "Noah Stokes."  The tipster provided the name of a child services group home where "Noah Stokes" previously lived, but had left that home after he turned 18 years old.  The tipster further stated that "Noah Stokes" was a "scam artist."

b.   Based on this information, the FBI Public Access Line representative used public database records to identify "Noah Stokes" as possible subject NOAH JAMAL STOKES.[3]

c.   On August 15, 2018, after receiving this information through FBI internal communication systems, SA Moore obtained STOKES' California Driver's License photograph. Additionally, SA Moore obtained a recent booking photograph from a June 29, 2018, arrest by the Covina Police Department on an outstanding arrest warrant.  SA Moore compared the photographs to the robbery surveillance footage and concluded that they depicted the same individual.

d.   SA Moore informed other law enforcement agencies involved in the investigation of the Twirly Head Bandit, including the Los Angeles County Sheriff's Department and the Culver City Police Department, that STOKES was the likely subject.

---

[3] The Public Access Line representative also provided personal identifiers for STOKES, including his date of birth, Social Security Number, and address.  The address provided by the Public Access Line was not the SUBJECT PREMISES.

11.   I reviewed information from the Culver City Police Department that included information obtained from the Covina Police Department and learned the following:

a.   At or about 2:36 a.m., on June 29, 2018, STOKES was contacted by Covina Police Officers as he slept in a gray Infiniti Q50 with paper plates in the parking lot of a Pep Boys on Azusa Avenue.  STOKES identified himself to the officer and admitted that he had an arrest warrant.  He was subsequently arrested and transported to the Covina Police Department Jail where he was booked on three misdemeanor warrants and later released.

b.   The booking photos from STOKES' June 29, 2018, arrest looked identical to the "Twirly Head Bandit" seen on surveillance footage from the banks.  STOKES has the same facial features, mustache, goatee, and sideburns as the subject seen on surveillance footage.  Additionally, STOKES had remnants of the same twirly-shaped design shaved in his hair and as the subject seen on surveillance footage from the attempted bank robbery on June 25, 2018, despite his short hair having grown slightly. STOKES is a black male, twenty-one years of age, six feet tall and 176 pounds.

12.   I know from my conversations with SA Moore that, on August 16, 2018, SA Moore spoke with Culver City Police Detective Ryan Thompson, and learned that Detective Thompson had used public database records to identify the phone number 310-625-3037 as a phone number associated with STOKES.  Detective Thompson then obtained cell phone records, including AT&T

Historical Precision Location Information, for the 310-625-3037 number. Detective Thompson learned that STOKES had obtained telephone number 310-625-3037 with AT&T on June 2, 2018. I have reviewed the AT&T Historical Precision Location Information for the phone number associated with STOKES and learned that STOKES' phone was at or near the last seven of the eight robberies near the times of the robberies:

a.   The attempted robbery on June 25, 2018 at the Bank of America located at 9453 Culver Boulevard in Culver City, California.

b.   The robbery on June 28, 2018 at the Chase Bank located at 102 West Foothill Boulevard in Monrovia, California.

c.   The robbery on July 6, 2018 at the Citibank located at 161 West California Boulevard in Pasadena, California.

d.   The attempted robbery on July 7, 2018 at the Bank of America located at 1450 West Redondo Beach Boulevard in Gardena, California.

e.   The attempted robbery on July 7, 2018 at the Bank of America located at 13905 Pioneer Boulevard in Norwalk, California.

f.   The robbery on July 7, 2018 at the U.S. Bank located at 15943 Paramount Boulevard in Norwalk, California.

g.   The attempted robbery on July 7, 2018 at the Chase Bank located at 1435 East Gage Avenue in Los Angeles, California.

## V.  IDENTIFICATION OF THE SUBJECT PREMISES

13.  I believe that STOKES is residing at the SUBJECT PREMISES for the following reasons:

a.   On or about August 15, 2018, I received STOKES' California Driver's License information from SA Moore and saw that the address listed for STOKES was the SUJBECT PREMISES.

b.   On or about August 22, 2018, I spoke with SA Moore and learned that the AT&T Historical Precision Location Information referenced in paragraph 12 indicated that STOKES' phone was at or near the SUBJECT PREMISES on the morning of August 22, 2018.

c.   On August 22, 2018, the Los Angeles County Sheriff's Department arrested STOKES at the SUBJECT PREMISES on two outstanding misdemeanor warrants.

## VI. TRAINING AND EXPERIENCE ON BANK ROBBERY

14.  Based on my training and experience, as well as my conversations with other law enforcement agents who investigate bank robberies, I know the following:

a.   Bank robbers commonly store the proceeds of their robberies in their homes and cars, where they are readily available and concealed from law enforcement.

b.   Bank robbers may go to great lengths to hide and secure the proceeds of their illicit activities and other items of value.  This is to safeguard those items against robbery and keep them hidden from law enforcement.  Bank robbers hide these items by storing them in secure locations, including safes, vaults, or other locked containers.  Other methods of

concealment include the burial of items underground, the use of locked cars, trailers, out buildings, sheds, and exterior closets, the use of natural spaces within walls, furniture, cars, and other areas, and the use of sealed cans and canning machines.

      c.  Bank robbers often keep the clothing worn during past robberies, even when such robberies were captured on surveillance footage.

      d.  Bank robbers may use open source or commercially available maps in order to locate robbery targets and plan routes of transportation.  Such maps may be contained in books or other printed materials or accessed via digital devices.

      e.  Individuals involved in criminal activity, including bank robbers, frequently take, or cause to be taken, photographs and videos of themselves, their criminal associates, their real and personal property, and the proceeds of their criminal activity.  Such items are often stored in their homes and cars, and on digital devices.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

15.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the

17

integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[4] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-

---

[4] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

18

available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

          e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,

                                19

what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image

file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

16.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    <u>CONCLUSION</u>

17.  For all the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. § 2113(a), as described above and in Attachment B of this

affidavit, will be found in a search of the SUBJECT PREMISES, as

further described above and in Attachment A of this affidavit.

In addition, there is probable cause to believe NOAH JAMAL

STOKES has violated 18 U.S.C. § 2113(a) (bank robbery).


_____
Gary D. Wallace, Special Agent
Federal Bureau of
Investigation


Subscribed to and sworn before me
this _____ day of August, 2018.


_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE